Ransone *vs.* Christian.

JULIEN RANSONE, plaintiff in error, *vs.* HOPE H. CHRISTIAN, defendant in error.

1. When, in an action for damages for the publication of a libel, the defendant pleaded justification:

*Held*, That, under the law of this State, (Code of 1873, section 3051,) this admitted not only the publication, but the manner of it, as charged in the declaration.

2. Whilst this Court will be slow to interfere with the verdict of a jury in a libel case, on the ground that the damages are excessive, yet, in such cases, it will look closely into the rulings of the Court, and if there be errors which may have influenced the jury in the amount of their verdict, a new trial will be granted.

3. It is only in actions of *tort*, and where there are circumstances of aggravation, that a jury is authorized to give punitive damages, and whether such circumstances do, in fact, exist, is a question for the jury, and not for the Court, to decide.

4. If, in an action for a libel, the defendant pleaded justification, and failed to make out his plea, the plea itself is a circumstance which the jury may, in fixing the amount of damages, consider as aggravating the *tort*, but the jury is not bound, in all cases, so to consider it; on the contrary, if the defendant show strong grounds in support of the charge he has made, though he does not fully support his plea, the jury may, if it see fit, consider these grounds as mitigating circumstances, and reduce the damages accordingly.

5. It is error in the Court to exclude circumstances going to show that the plea of justification is true, as when a defendant undertook to show that the plaintiff was guilty of perjury in swearing that the contents of a certain bond represented the truth of a certain contract between himself and another, and the Court ruled out certain acts and sayings of

Ransone *vs.* Christian.

the plaintiff, inconsistent with the provisions of the bond, as they appeared on its face.

6. In this State, as provided by section 3261, Code of 1873, the defendant, in an action *ex delicto*, may plead, as a defense, any claim he may have against the plaintiff, which arises *ex delicto*.

Libel. Justification. Damages. Evidence. Recoupment. Before Judge Harrell. Early Superior Court. October Term, 1872.

Christian brought case against Ransone for $25,000 00 damages, alleged to have been sustained by the plaintiff by reason of the following libelous publication by the defendant:

"Oakland, May 29th, 1871.

"*Dr. Hope H. Christian:* I have not before this pursued the course I now adopt, because a misconstruction of my motives might have prejudiced some member of the jury in your favor. During the term of the Superior Court held in Blakely, April, 1870, where, in a set speech made to a jury of your neighbors by Judge Clarke, you were pronounced a perjurer. You, employing the Ransy Sniffle of the town as a 'go-between,' demanded and received from Clarke a retraction. Since that time, the gang with which you prowl, by open declaration as well as by innuendo, no doubt with your sanction, and very probably at your suggestion, have magnified your valor and chuckled at your successful swaggering. That you should have nerved yourself to the point of defying a minister of the church—women and children having done your fighting during a four years' war, while you were skulking at the bunghole of a whisky barrel, disgustingly dubious whether to swill or coin the contents—was wonderful, and worthy of the applause of such as those who found congeniality in your companionship.

"I propose to give you herein, as explicitly as a limited space and a scanty vocabulary will permit, my opinion of yourself and the thievish conspiracy upon which Clarke commented so injuriously to your feelings. This is the history

Ransone *vs.* Christian.

of your attempted but baffled robbery: In 1863, after plotting—for it required other knavery in addition to your own to perfect the swindle—you accomplished the first move, the consent to the exchange of genuine property, both land and money, for that which neither you nor your principal and accomplice owned or ever would own.   The reduction of this agreement to writing then and there, because that would have prevented the second cheat, its possibility having been but just suggested to you by an incident of the moment and the ease by which the first had been effected—you, by an impromptu lie, postponed.   Emboldened by this success you devised a cunningly worded document, binding the transfer of another's land to yourself, and lyingly asserting the payment of an equivalent therefor.   Spied upon your victim, an old man, until sickness had prostrated his body and obscured his perceptions, presented your cozening paper, overcome by importunity his objections to transacting business in such an unfavorable condition, and obtained his signature; then, by a prepared lie, told at a chosen moment, you filched from him $1,000 00 as boot between the lands.   Having gone thus far, and failing to palm off your fraudulent bond upon a purchaser who knew you too well to imagine that in your possession implied an honest ownership, you put it carefully away and waited impatiently for the grave to receive your fancied dupe and deliver to you your booty.   Death would not come, and the Legislature enacted the statute of limitations.   Into Court you had to go or relinquish a part of your 'swag.'   To relinquish a part of your 'swag,' or to establish your claim by perjury, was also a necessity.   This was all that was needed to complete the infamy of your scheme, and therefore, inflame your ardor in its prosecution     .

" To the fabrication of plausible perjury you then applied yourself, and your testimony is the outcome of that diligence. Clarke, I am told, characterized your evidence simply as unvarnished perjury, at which detraction from your depravity you were very naturally indignant.   Revolting as is that crime, and odious as is its commission, he did you injustice,

gross injustice (although in his subsequent correspondence he felicitated himself on the kindly relations existing between you.) Such genius as yours, reveling in moral muck and eargerly burrowing to the very bottom of turpitude, should not be fobbled off with so miserly a tribute. ...... extemporized, crude perjury, like an ordinary, untutored liar, was obviously far below the design of rapacious craft, rooted in slimy profligacy, and further fertilized by the rankest family corruptions; a felony, though the foulest that might be practiced by tyros, offered too little criminal garbage to appease your ravenous gluttony; malignant calumny relishingly supplemented the staling flavor of the original roguery; tricky, expert and shameless, you must fashion the raw lie into a finished villainy, before your exacting taste in fraud could find its full enjoyment. Your perjury was meditated long and deeply, elaborated with care and skill, and repeatedly rehearsed, until your loathsome admiration of its flagitious perfections broke forth in boasts to those with whom you conversed.

"This studiously composed, maturely considered, and thoroughly digested perjury was, too, for lucre, filthy, indeed, and paltry in amount. Your crime, while devilish from its prolonged contemplation, is despicable from the shabby reward for which you wrought. A penniless pimp would have scorned a secret tender of that temptation for which you yourself have published your prostitution. Yours was a deliberately, patiently, calmly concocted device, for the success of which you invoked the aid of God, through calumnious perjury, to perpetrate a petty theft. It has failed; your zealously contrived machinations have only served to demonstrate beyond the possibility of doubt, that *you are an abject liar, and a vile, groveling, sordid, scurvy scoundrel, with the appetite of a sneak thief, and without the intelligence to compass its gratification.* From richly merited punishment you are protected as is the skunk; your filth, however, shall not afford impunity to insolence as well as to swindling, perjury and calumny, and I thrust before your eyes the assurance

that every demand from you, similar to the one alluded to in the outset of this letter, will receive instant attention ; accorded to it solely that an abominable nuisance may be abated.

(Signed)                       " JULIEN RANSONE."

"N. B. Should your courage prove to have been exhausted in the bullying of a preacher, I now notify you that it is my intention to distribute printed copies of this letter throughout this community and Montgomery, Alabama, where I am informed you may go, so that those who are thrown in association with you shall not be ignorant of your true character.

(Signed)                       " J. R."

The defendant pleaded the general issue, and at some time during the trial, the record fails to disclose when, asked permission to amend the same by setting up the damages he had sustained by the act and conduct of the plaintiff. The amendment was not allowed, and the defendant excepted.

The defendant also proposed to file an equitable plea, to the effect that, since the bringing of said action, the plaintiff made an unprovoked assault upon the defendant with the intent to murder him, and wounded him by several shots fired from a pistol, one striking him in the thigh and hip, and the other in the ankle, from which wounds he has been confined to his bed for the space of twelve months, is still unable to walk, and is apprehensive that he will be a cripple for life, to his damage, $50,000 00. That defendant prays that this amount may be set off against any damages which the plaintiff may recover in his action, and that he may have judgment for the excess. That unless this is allowed, he will be remediless, on account of the non-residence and insolvency of the plaintiff.

The Court refused to allow said plea filed, and the defendant excepted. .

The plaintiff introduced evidence, showing that the paper set forth in his declaration was in the handwriting of the defendant, and its publication.

The defendant then filed the plea of justification, and introduced the following evidence:

1st. Bill in the case of Hope H. Christian vs. James B. Ransone, filed to October term, 1869, of Early Superior Court, setting up that the complainant paid to the defendant $1,000 00 in cash for lot seventy-four, in the sixteenth district of Early county; that defendant executed and delivered his unconditional bond dated May 11th, 1863, to make titles to said lot on January 1st, 1864; that defendant had refused to make titles, and praying specific performance.

2d. Answer of the defendant, denying that complainant had ever paid $1,000 00, or that he had ever given to him an unconditional bond to make titles to said lot on January 1st, 1864.

3d. John T. Clarke, who testified substantially as follows: Upon the trial of the above stated case, Christian testified that James B. Ransone owned lot seventy-four, and he desired to buy it to settle on; that James B. agreed that if he could induce Martha Stamper to sell him (James B.) lot eighty-five, he would sell to Christian lot seventy-four for $1,000 00 in cash; that Stamper authorized Christian to make such arrangement; that Stamper had contracted for lot eighty-five with Mitchell, but had neither paid for it nor received titles; that Stamper executed his bond to James B. to make titles to lot eighty-five, by January 1st, 1864, and delivered it to Christian to be carried to the obligee; that James B. requested and authorized Christian to pay Stamper $1,000 00 for him as a part of the purchase money for eighty-five, and that he paid said sum as directed, and received Stamper's bond to James B., and a written showing that he had made the aforesaid payment; that he (Christian) delivered said instruments to James B., and received from him his note for $1,000 00, payable to Stamper on January 1st, 1864, and his unconditional bond to make titles to him (Christian) on the day last aforesaid; that this bond sets forth the true contract between him and James B.; that he carried but one paper besides the bond from Stamper conditioned to make titles to lot eighty-

five to James B., to-wit: the aforesaid written showing, on the strength of which said James B. executed the bond to lot seventy-four to him.

Witness does not remember that Christian made any explanation of said written showing upon that trial; he might have done so at the subsequent trial, at which there was a material difference in Christian's testimony. At the time, witness, as attorney for James B. in the above stated case, examined Christian as to said written showing, he did not exhibit it until after the latter had testified as to its contents. He afterwards presented it to Christian, who identified it as the paper; he declined to hand the paper to opposite counsel until he had tendered it in evidence. Christian was subsequently recalled, but he does not remember his making any explanation.

4th. The written showing alluded to:

"*Mr. James B. Ransone—Sir:* From consultation and my own opinion, it will be well to give bond, as I have no deed. You can make Dr. Christian a deed or give him a bond to make titles when I make you a title to eighty-five. I make a bond to make titles when the note is due. You make and send bond by the Doctor. This 30th April, 1863.

(Signed) "M. W. STAMPER."

5th. James B. Ransone testified as follows: Upon the trial of the case between witness and Christian, the latter testified that he had made an agreement with witness that if he would induce Stamper to sell lot eighty-five to witness for $2,000 00, that witness would sell lot seventy-four to Christian. Witness states most positively that he never did make any such agreement with Christian, and he knows it.

Christian swore that witness had authorized and requested him to pay to Stamper $1,000 00, which statement witness says is false; that he never requested Christian to pay any sum whatever to Stamper.

Christian further testified, that when he carried Stamper's bond to witness, he also delivered a written showing from

Stamper, to the effect that he (Christian) had paid Stamper $1,000 00 for witness, which statement witness says is false. Christian never did bring but one written paper from Stamper, which is the one exhibited and which contains no such statement.

Christian also testified that the bond to lot seventy-four, which witness delivered to him, was absolute and unconditional, and set forth the true terms of the contract. This statement is false. Christian came to witness some time in 1863 and stated that Stamper had authorized him to exchange lot eighty-five for lot seventy-four, if witness would pay $1,000 00 to boot. Witness, thinking he could make better terms with Stamper, put Christian off. Christian informed him that Stamper had agreed to let him have lot seventy-four to settle on. The matter rested thus until Stamper came to see witness at his house. Stamper refused to take less, and witness agreed to the exchange upon the terms first proposed. Stamper stated that he had not paid Mitchell the purchase money for lot eighty-five, and could only give bond for titles. Witness stated that he was willing, upon the promise of Stamper to pay Mitchell soon, to exchange bonds, obligating each to make titles on January 1st, 1864, witness agreeing to give his note for $1,000 00, and his bond to make titles to Stamper to lot seventy-four, when he, Stamper, should make titles to witness to lot eighty-five. Stamper remarked that he preferred to consult counsel before he proceeded with the matter. Some time afterwards, Christian came to witness with a written paper from Stamper, which is in evidence, and a bond for titles to lot eighty-five. As this was the agreement witness had previously made, witness accepted the bond and proposed to make a bond to lot seventy-four, when Christian said there was no witness and he would call again. About two weeks afterwards Christian returned, at which time witness was lying on a couch sick with fever and in no condition to transact business. Witness is very aged. He told Christian that he was unable to write a bond. Christian replied that he had brought a bond already prepared. He seemed to

have a good deal of solicitude and anxiety to have the bond then signed. Witness did not read the bond, but asked Christian if it was in accordance with the terms of the agreement made with Stamper? Christian replied that it was, and witness, trusting to his honor, signed the instrument. He did not see the bond from the time it was signed until he was sued upon it. It was not made in accordance with the terms of his contract with Stamper.

6th. The defendant, Julien Ransone, testified substantially as follows: The written copies of the libel (introduced by the plaintiff for the purpose of showing publication) exhibited, he never saw or heard of before. He did not write or publish them, and scorns so low an act, and spurns with indignation every effort to raise a suspicion that he was the author of said written copies. Admits that he wrote the paper set forth in the declaration, but had no idea of writing or publishing a libel. His only intention was to force Christian to send him a challenge, and it was verbose to intensify the insult. He doubted Christian's courage, and sent it by McIntosh to insure his getting it; hence, he requested McIntosh to see Christian read it.

7th. The bond from James B. Ransone to Hope H. Christian, dated May 11th, 1863, binding him unconditionally to make titles to lot seventy-four, on January 1st, 1864, acknowledging the receipt of $1,000 00 in payment therefor.

8th. Bond from Martin W. Stamper to James B. Ransone, dated April 28th, 1863, reciting the sale of lot eighty-five to Ransone for $2,000 00, $1,000 00 of which amount was unpaid, and obligating Stamper to execute a title to the same on January 1st, 1864, provided a note for the amount last aforesaid was paid by Ransome by that time.

9th. The plaintiff, Hope H. Christian, testified substantially as follows: He did not testify that James B. Ransone requested and authorized him to pay Stamper $1,000 00, but he stated that this was the general understanding of the parties. When Stamper was at the house of witness, he asked him to give him (witness) such a paper as would show that he

had arranged with him for said James B. for the $1,000 00. He went out to attend to domestic business, and when he returned he found the note alluded to lying on his table. He supposed that Stamper had done as he was requested. When he carried it to James B. Ransone, it was so badly written that it took both of them to read it. When witness was recalled on the first trial, he explained that it had been so long since he had seen the letter, he could not recollect what it contained.

The jury returned a verdict for the plaintiff for $6,000 00. The defendant moved for a new trial upon the following grounds, to-wit:

1st. Because the verdict was contrary to the law and the evidence.

2d. Because the amount of damages was excessive, there being no allegation or proof of special damages.

3d. Because the Court erred in charging the jury "that the filing of the plea of justification in this case, admitted the publication of the libel as alleged in the declaration."

4th. Because the Court erred in charging the jury "that if the plea of justification is not sustained, the plaintiff is entitled to damages, the amount of which they were to determine from the proof," there being no evidence as to any damages.

5th. Because the Court erred in the following charge: "that in this case, they (the jury) are not confined to actual damages, but may take into consideration the nature of the libel, and the injury to the feelings and reputation of the plaintiff, and find in addition to the actual damages which may be proved, or even if no actual damage is proved, vindictive or exemplary damages, not only to compensate plaintiff for the injury to his feelings and reputation outside of any actual damage, but to deter the defendant from like wrongs," in this, that the charge about actual damages misled the jury, as there was no actual damages alleged or proven, for that the additional damage cannot be given by a jury, either to deter a wrong-doer, or as a compensation for wounded feelings, unless the proof shows aggravating circumstances either in

the act or intention. Said charge being further illegal in this, that vindictive or exemplary damages can only be recovered when the entire injury is to the peace, happiness or feelings of the plaintiff, the only guide being the enlightened consciences of impartial jurors, in connection with which the worldly circumstances of the parties should be weighed, of which circumstances there was no proof, and therefore, said charge should not have been given.

6th. Because the Court erred in charging the jury, "that if they believed from the evidence, that in addition to the writing and publication of the libel, the avowed object of the defendant was to provoke a challenge and fighting, such being a violation of law, should not be considered in mitigation, but in aggravation of the offense."

7th. Because the Court erred in charging the jury, "that if the plea of justification is filed and is not made out, the filing is an aggravation of the libel, and if the jury find for the plaintiff, they have the right to take into consideration the filing of the plea, and may, if they see proper, and in fact, they are bound to increase the damages by reason of the filing of the plea, if not sustained."

8th. Because the Court erred in refusing to allow defendant's counsel to prove by James B. Ransone, that Hope H. Christian had never called upon him to comply with the obligation and make titles to lot seventy-four, as set forth in the bond for titles from said Ransone to said Christian, but, on the contrary, had stated to him that he was trying to induce Stamper to comply with his contract, so that both parties could obtain titles.

9th. Because the Court erred in refusing to allow the defendant to show that the bond from James B. Ransone to Christian was transferred the day after its execution to one Benjamin Fryer, by a written transfer upon its back, which said transfer was concealed from view by a number of revenue stamps.

(NOTE TO THIS GROUND.) "The Court refused to permit the bond to be defaced for this purpose. The counsel for de-

fendant stated that such transfer was on the bond, but it did not appear as the bond was then shown."

10th. Because the Court erred in refusing to allow the defendant to amend his pleadings, and to file an equitable plea of set-off, as above set forth.

The motion was overruled and the defendant excepted, upon each of the grounds aforesaid.

FLEMMING & RUTHERFORD, for plaintiff in error.

A. HOOD; I. E. BOWER; T. F. JONES; H. & I. L. FIELDER; R. H. POWELL, for defendant.

McCAY, Judge.

Were we perfectly satisfied with the rulings of the Court on the trial of this case, and with his charge to the jury, we should not interfere with the verdict. Our Code, (1873,) sections 2947, 3067, gives, in express terms, to the jury large discretion in such cases, and the Courts ought not to interfere with the finding, unless it be so grossly contrary to what is proper as to leave the impression that there was undue bias, prejudice or mistake. But for this very reason it should appear that there was no error in the Court calculated to affect the verdict.

In ordinary cases, when the verdict is for the plaintiff or defendant, if there be an error, and the evidence is so strongly with the verdict that the result must have been the same, even had there been no error, it is mere play to send the case back on a theoretical mistake of the Judge. But when the *amount* of the verdict is a matter to be measured by the enlightened conscience of a jury, then it is of the utmost importance that the jury shall not have been in the least misled as to the principles upon which their verdict is to be founded, or any evidence excluded which may have affected the final decision. In this case, the defendant pleaded justification. If this plea was not fully made out, the plaintiff was entitled to a verdict. But the amount of that verdict is a thing to be settled by the

jury, according to the evidence and to the nature of the case. It is manifest that in doing this, they ought to have every fact before them calculated to inform their consciences, and that there be no illegal instruction as their guide. If there be error in the Court in these particulars, who can say how largely this error may have influenced the amount of the verdict? We think there was error in excluding the proof that Christian had not, from the date of the bond, May 11th, 1863, until the fall of 1869, called upon the maker of it for a title, and that he had informed Mr. James B. Ransone that he was trying to induce Stamper to pay for lot eighty-five, so that all parties could get their titles.

The point of the charge of perjury was, that Christian swore that the bond of James B. Ransone to lot seventy-four contained the true contract between the parties, and that this was not true. Now any act or saying of Christian going to show that this was not the true contract, was, as we think, material to the issue. Was not the fact that Christian quietly stood by for six years and did not demand of James B. Ransone a title in pursuance of the bond, a circumstance of considerable weight in favor of old Mr. Ransone's statement? Was not the fact (if it was true) that Christian had said he was trying to get Stamper to pay for lot eighty-four so that *all parties* could have their titles made, also a circumstance going to show that the true contract was that Ransone's making a title was to depend on his getting a title from Stamper to the other lot? Christian's delay in demanding the title is, unless explained, inconsistent with the idea that the bond of Ransone was absolute. It was one of the issues whether that bond spoke the truth, nay, that was almost the sole issue in this case, as well as in the equity case, and these circumstances were material, as they tended to show that Christian had acted and talked as though Ransone's story was the truth, and the bond not the truth. Nor does it make any difference that these facts were proposed to be proven by Ransone; it does not appear that it was or is one of the issues whether these facts were true. Perhaps Christian did not, at the trial of the equity

case, deny them. Nor does there seem any reason why Ransone might not prove these circumstances as well as the other facts, even if Christian did deny them.

We think there was error in ruling out this testimony. We think the same as to the entry on the bond. The paper had ceased to be any longer an existing obligation. The decree in the equity case had made it the property of Ransone, and he had the right to mutilate or destroy it if he saw fit. If the bond was in fact transferred, this was a circumstance contradicting to some extent Christian's statement of his anxiety to get the land in 1864 to build on, and stands on the same footing as his delay to ask for the deed and his efforts to get Stamper to comply with his bond, so that he might get a deed.

We are inclined to think that, under our law, the plea of justification admits all the charges in the declaration, as to not only the fact but the manner of publication. The language of the Code is very broad: Code of 1868, section 2996. " By such plea he admits the act to be done." The act and the manner of it are difficult to separate. If the plaintiff is still to prove the mode of publication, he gains very little by the plea, whilst he loses the privileges of one holding the affirmative of the issue.

Punitive damages are only to he given if there be circumstances of aggravation. Whether there be such circumstances or not, is a question for the jury, and not the Court. Even if there be a plea of justification, it is for the jury to say whether there are circumstances of aggravation; that is, whether the admitted facts are of such a character as to constitute matter requiring punitive damages. It may be that the Judge, in using the words "in this case," only intended to say, "in the case I have supposed;" but the language is very fairly susceptible of being understood as meaning by "this case," the case on trial, and was calculated to mislead the jury. Whether the case was a *tort* attended with aggravating circumstances, was a question for the jury alone under the proof, and it was not proper for the Judge to say to them

Ransone *vs.* Christian.

that in "this case" it was their right to give punitive damages.

The filing of a plea of justification *may*, if it be not sustained by the proof, be a circumstance of aggravation, but we think it was error in the Court to tell the jury that it *must* be so considered by them. All that it was in the province of the Court to say on the subject, was to tell them that the filing of the plea, if the proof failed to sustain it, was a matter which the law authorized them to consider as an aggravation. But it is for the jury, under all the facts of the case, to say if the plea shall have that effect. It may be that the plaintiff's conduct has been such as, whilst it does not completely justify the charge made by the defendant, does yet greatly mitigate and excuse it. The jury may not be quite satisfied that the charge is true, and yet they may feel, from the evidence, that the plaintiff ought not to be considered as grossly in ,the wrong in making it. In other words, the facts as proven, may show mitigating circumstances as to the act of filing the plea, and the jury may take them into consideration notwithstanding the plea of justification on this question of aggravation.

Section 3261 of the Code of 1873 is as follows : " All claims arising *ex contractu* between the same parties may be joined in the same action, and all claims arising *ex delicto* may in like manner be joined. The defendant may also set up as a defense all claims against the plaintiff of a similar nature with the plaintiff's demand."

It is impossible to escape from the conclusion that by *claims* of a similar nature with the plaintiff's demand, is meant claims arising *ex delicto* or *ex contractu*, accordingly as the demand of the plaintiff is *ex contractu* or *ex delicto*.

We are free to say that this seems to us to be a very startling provision of the Code, and one which a common law lawyer must read with astonishment, especially when it is remembered that in this State special pleading is abolished and a case goes to the jury on the declaration and pleas. But, *ita*

*lex scripta est,* and we have nothing to do but to enforce it as best we may.

If one *tort* may be set off against another, we see no reason why an *assault* and battery may not be set off against a libel, as one libel against another. We can see how an attempt to do either may involve very complicated inquiries before a jury. But that is a characteristic of our whole system of pleading, and is, perhaps, no greater evil in the trial of an action *ex delicto* than in the trial of an action *ex contractu.* In an action on a bond, the defendant may plead an open account as an off-set; nay, he may set up a balance due on the settlement of a partnership, and force an investigation of great complication.

Judgment reversed.